UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JAMES P. COLLITON,

       Plaintiff,

  -against-

FIDEL GONZALEZ, MATTHEW T. BOYD,
MARTIN F. HORN, PATRICK WALSH,
CAROLYN THOMAS, & EMMANUEL
BAILEY,

       Defendants.

---

07 Civ. 02125 (RJH) (MHD)

**MEMORANDUM OPINION
AND ORDER**

  Plaintiff James P. Colliton, appearing *pro se*, moves for reconsideration of portions of this Court's September 16, 2009 decision, which granted in part and denied in part defendants' motion for summary judgment on plaintiff's § 1983 claims for alleged violations of his constitutional rights while plaintiff was incarcerated as a pre-trial detainee.  He also moves to amend his complaint to assert claims against defendants for alleged violations of his religious rights under the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. § 2000cc-1.  For the reasons stated below, Colliton's motion for reconsideration is granted in part and denied in part; on reconsideration defendants are granted summary judgment on Colliton's deliberate indifference to safety claim and that claim is dismissed; and Colliton's motion to amend his complaint is denied.

## I. BACKGROUND

In March 2006, Colliton, a former attorney at one of New York City's most prestigious law firms, was arrested on charges of raping thirteen- and fifteen-year-old girls, patronizing a prostitute, tampering with a witness, and bribing a witness. (Def.'s 56.1 Statement ¶ 5.) Colliton's arrest garnered significant media attention. In the wake of his arrest, Colliton was incarcerated as a pre-trial detainee at Rikers Island. (*Id.* ¶ 6.) Colliton was initially housed in the Close Custody Housing Unit ("CCHU")—the highest level of protective custody—but was transferred to a General Population Escort ("GPE") housing unit on June 29, 2006. (*Id.* at ¶¶ 7, 37.) GPE is a lesser form of protective custody in which inmates are housed with the general prison population, but are monitored by at least one Correction Officer at all times and are kept separate from other category inmates at meals and during recreation sessions. (Walsh Decl. ¶¶ 13-15.)

In March 2007, Colliton filed a complaint in this district seeking relief pursuant to 42 U.S.C. § 1983 for various alleged violations of his constitutional rights during his incarceration at Rikers Island.[1] Colliton alleged, *inter alia*, that his constitutional right to the free exercise of his religion was violated by a rule that prevented him from attending congregate Catholic mass while he was housed in CCHU; that he was denied law library access; that he was assaulted by a corrections officer at the direction of defendant Officer Matthew T. Boyd; that he did not receive adequate medical treatment; and that various prison officials were deliberately indifferent to his safety by transferring him over his vehement objections from CCHU to GPE where he was allegedly terrorized and attacked by other inmates, and by refusing to transfer him back upon his request. In connection

---

[1] The Complaint was dated January 25, 2007, but filed on or about March 13, 2007.

with his last claim, Colliton alleges that in May and June 2007, while he was housed in GPE, he was involved in three incidents in which he was assaulted by other inmates.

In October 2007, Colliton was released from prison after pleading guilty to one charge of rape in the third degree, one charge of rape in the second degree, and one charge of patronizing a prostitute. (*See* Def.'s 56.1 Statement. ¶ 93; Colliton Dep. at 52.) On or about May 6, 2008, Colliton filed an Amended Complaint. The Amended Complaint repeats the same allegations as the initial complaint, but includes additional allegations regarding the three inmate incidents in May and June of 2007. Colliton seeks compensatory and punitive damages for the alleged constitutional violations.

After the close of discovery, defendants moved for summary judgment on all of Colliton's claims. In an oral decision on September 16, 2009, the Court denied defendants' motion for summary judgment in part and granted it in part. The Court held that there was a triable issue of fact with respect to whether defendant Boyd engaged in excessive force against Colliton by directing an unnamed corrections officer to assault him, but dismissed all the other claims. The Court, however, granted Colliton leave to move to amend his complaint to assert claims under RLUIPA. Thereafter, Colliton submitted a fax requesting reconsideration of (1) the Court's denial of his law library access claim; (2) the Court's denial of his Free Exercise of religion claim; and (3) the Court's denial of his failure to protect claim arising out of his retention in GPE after being transferred there from CCHU.[2] Colliton also separately moved to amend his pleadings to assert claims against defendants under RLUIPA.

---

[2] It is not generally the practice of this Court to accept letters requesting reconsideration of its decisions by facsimile. *See* Local Civil Rule 5.3(b) ("[N]o paper shall be served by facsimile unless the parties agree in writing in advance to accept service by this means or it is ordered by the assigned judge."). Parties seeking reconsideration of an opinion must file a motion for reconsideration and serve it on the opposing party in

3

## II.  DISCUSSION

**A.  Motion for Reconsideration**

"Reconsideration of a court's previous order is an extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources." *Finkelstein v. Mardkha*, 518 F. Supp. 2d 609, 611 (S.D.N.Y. 2007) (internal quotation marks omitted).  Under Local Civil Rule 6.3, reconsideration is appropriate if the court overlooked controlling decisions or factual matters which, had they been considered, might reasonably have altered the result of the underlying decision.  *See Levine v. AtriCure, Inc.,* 594 F. Supp. 2d 471, 474 (S.D.N.Y. 2009).  To that end, "[a]ny controlling decisions or factual matters presented by a litigant for reconsideration must have been put before the Court in the underlying motion."  *Padilla v. Maersk Line, Ltd.,* 636 F. Supp. 2d 256, 258 (S.D.N.Y. 2009).  Alternatively, a court may grant such a motion to correct a clear error or prevent a manifest injustice.  *Beljakovic v. Melohn Properties, Inc.*, 542 F. Supp. 2d 238, 244 (S.D.N.Y. 2005).  Finally, "[a] motion for reconsideration is not a motion to reargue those issues already considered when a party does not like the way the original motion was resolved."  *Finkelstein*, 518 F. Supp. 2d at 611 (internal quotation marks omitted).

---

accordance with Local Civil Rules 5.3, 6.1, 6.3 and the relevant provisions of the Federal Rules of Civil Procedure.  In light of Colliton's *pro se* status, the Court will treat Colliton's letter as a motion for reconsideration because the letter was submitted to chambers and defendants within the time limit for filing a motion for reconsideration, and Colliton's failure to abide by the strictures of the relevant rules does not appear to have caused any prejudice to defendants.  However, the Court cautions Colliton that it will scrutinize any future requests for leeway in complying with procedural rules closely, in light of the fact that Colliton is a trained attorney and a former member of the state bar.  *See Harbulak v. Suffolk County,* 654 F.2d 194, 198 (2d Cir. 1981) (because plaintiff was a practicing lawyer, "he cannot claim the special consideration which the courts customarily grant to pro se parties"); *Glatzer v. Barone*, 614 F. Supp. 2d 450, 451 n.1 (S.D.N.Y. 2009) ("The Court takes Glatzer's status as an attorney and former member of a state bar into account in considering the degree of litigational latitude that should be accorded him as a pro se plaintiff.").

### 1. Law Library Access Claim

Colliton asks this Court to reconsider its dismissal of his law library access claim on the ground that there was insufficient evidence in the record regarding the purpose of the restrictions on law library access to support dismissal of that claim. (*See* Pl.'s Letter Mot. for Reconsideration at 1-2.) Colliton argues that "the Court indicated at oral argument that it was granting defendants' motion relative to . . . law library access based upon the case law allowing deprivations when there are 'reasons related to legitimate penological interests.'" *Id.* However, Colliton appears to have misunderstood the Court's oral decision on his law library access claim. In its decision, the Court dismissed Colliton's law library access claim on the ground that Colliton had not met his burden of showing that he was denied meaningful access to the courts. (Tr. of Hr'g of Sept. 16, 2009 ("Tr.") at 27-28.) The Court's dismissal of Colliton's law library access claim was *not* grounded in any conclusion regarding the legitimacy of the penological interests underlying the restrictions on law library access. (*Id.* at 26-28.) Because this part of Colliton's motion for is based on a misunderstanding of the Court's ruling, and because Colliton has not provided any other basis for this Court to reconsider its ruling on his law library access claim, the Court reaffirms its dismissal of Colliton's law library access claim.

### 2. Free Exercise Claim

Colliton also seeks reconsideration of the Court's dismissal of his Free Exercise claim against defendants Horn, Thomas, Gonzales and Bailey. Because Colliton

5

misunderstands the respective burdens on this question and his motion is merely one of disappointment with the Court's prior ruling, the Court reaffirms its dismissal of that claim.

Colliton, a practicing Catholic, was denied access to congregate religious services during the months that he was housed in CCHU at Rikers Island.[3] Colliton alleges that this violated his right to the Free Exercise of his religion under the First Amendment. Because the challenged restrictions are penological in nature and because Colliton was an inmate, Colliton's Free Exercise challenge "is judged 'under a reasonableness test less restrictive than that ordinarily applied': a regulation that burdens a right passes constitutional muster 'if it is reasonably related to legitimate penological interests.'" *Salahuddin v. Goord*, 467 F.3d 263, 274 (2d Cir. 2006) (quoting *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 (1987)). Accordingly, to determine whether Colliton's Free Exercise rights have been violated, the Court must answer two questions: (1) whether the restriction on congregate worship burdens Colliton's Free Exercise rights; and (2) whether the regulation or action was reasonably related to some legitimate penological interest. *Saluhuddin*, 467 F.3d at 275.

### a. Burden on Religious Exercise

A plaintiff seeking to bring a Free Exercise claim bears the initial burden to show that his religious exercise has been burdened by the government's actions or regulations. *Saluhuddin*, 467 F.3d at 275. There is some debate in this Circuit as to whether the plaintiff must show that the burden on his right is "substantial" in order to make out a

---

[3] Colliton was, however, permitted weekly visitation by clergy who presumably could provide all forms of religious worship other than collective worship. (*See* Def.'s 56.1 Statement ¶ 15.)

6

claim under the Free Exercise clause. *See Salahuddin*, 467 F.3d at 275 n.5 (citing *Ford v. McGinnis*, 352 F.3d 582, 591 (2d Cir. 2003)); *Graham v. Mahmood*, No. 05 Civ. 10071, 2008 WL 1849167, at *12 n.23 (S.D.N.Y. Apr. 28, 2008). The Court need not resolve this debate because even if the Colliton is required to show—and has shown—a substantial burden, Colliton fails to show that defendants' articulated justification is irrational.

### b. Reasonable Relationship to Legitimate Penological Interests

It is well-settled that a regulation that burdens a prisoner's Free Exercise rights passes constitutional muster "if it is reasonably related to legitimate penological interests." *Salahuddin*, 467 F.3d at 274. This burden is "relatively limited"; indeed it is merely one of articulation. *Id*. at 275; *Jones v. N.C. Prisoners' Labor Union, Inc.*, 433 U.S. 119, 127-28 (1977) ("[P]rison officials need only testify to the legitimate penological interests behind the challenged conduct to meet their burden of proof."). Prison security is undoubtedly satisfactory. *Thornburgh v. Abbott*, 490 U.S. 401, 415, 418 (1989) (stating that the legitimacy of prison security is "beyond question" since prison security is "central to all other corrections goals"); *Hall v. Ekpe*, No. 09-4492-pr., 2010 WL 3996211, at *2 (2d Cir. Oct. 13, 2010) (finding increased security in "reducing unnecessary inmate movement" a "valid penological interest"). Once defendants' burden is satisfied, the burden shifts to the prisoner to "show that these articulated concerns were irrational." *Salahuddin*, 467 F.3d at 275.

In its September 16, 2009 decision, the Court reasoned that, assuming Colliton could prove that the burden was substantial, defendants had satisfied their "relatively

7

limited burden of identifying the legitimate penological interests that justify the impinging conduct." (Tr. at 24 (citing *Salahuddin v. Goord*, 467 F.3d 263, 275 (2d Cir. 2006)).) Defendants had articulated security concerns regarding allowing Colliton to participate in congregate mass, to wit due to the broad media coverage of his arrests his safety in prison was threatened. (Heim Decl., Ex. D. (Walsh Aff.) ¶¶ 6, 9; *see also* Am. Compl. ¶¶ 102-104 ("All forms of media outlets, especially those most read, listened to and watched by detainees on Rikers Island, published and broadcast articles and stories . . . . Such publicity had the effect of rendering plaintiff one of the three most hated detainees on Rikers Island . . . . This directly resulted in plaintiff being regarded as one of the three most prime targets for continuously being terrorized, attacked, abused and threatened by fellow detainees.").) The Court found the burden satisfied because the restriction was meant "to ensure security for detainees [including Colliton] in the [CCHU] [and] [i]t is well established that restrictions aimed at protecting prison security serve legitimate penological purposes." (Tr. at 24 (citing *Thornburgh*, 490 U.S. at 415).) On the other hand, the Court held that Colliton had not met his burden of showing "that these [articulated] concerns were irrational." (*Id.* at 24.) Though Colliton had argued that the defendants "COULD have permitted CCHU detainees to participate in congregate religious activities SAFELY by permitting them to each occupy a space at the activity separate and apart from the other attending detainees," (Pl.'s Opp'n at ¶ 8 (emphasis in original)), the Court found Colliton's assertions too conclusory to enable a reasonable jury to find that the restriction on congregate worship lacked a reasonable relationship to legitimate penological interests.

8

Colliton now objects to that ruling, arguing that defendants' assertion that detainees were not permitted to attend congregate religious services "for security purposes" was insufficient because defendants failed to articulate in greater detail what those security purposes were, why they were legitimate, or how the restrictions at issue were related. (*See* Pl.'s Letter Mot. for Reconsideration at 1-2.) Colliton's argument, however, misunderstands the burdens involved in the relevant question. Defendants were required only to articulate a legitimate penological interest—and prisoners' and prison safety suffices. *Salahuddin*, 467 F.3d at 275; *Thornburgh*, 490 U.S. at 415. The burden then shifted to Colliton to prove that restricting him from congregate worship was not rationally related to that interest. *Hall*, 2010 WL 3996211, at *2. The burden did not stay with defendants to "identify[] **how** the unstated reasons were related to the unstated purposes/objectives." (Pl.'s Letter Mot. for Reconsideration at 1 (emphasis in original).)[4] Colliton argues that he, as a *pro se* litigant, should not be obligated to come up with arguments refuting defendants' articulated penological interest. (*Id.* at 2.) But Colliton is a highly-trained attorney and, in any event, the protections afforded *pro se* litigants do not lessen a litigant's evidentiary burdens and the requirements imposed by substantive law. Indeed, Colliton's own pleadings undermine any argument that he was unable to comprehend defendants' security concern. (*See* Am. Compl. ¶¶ 102-104 (noting that Colliton was among the three most notorious prisoners at Rikers Island, and thus "one of the three most prime targets" for various safety concerns).) Fundamentally, Colliton's problem is not with the Court in misapplying the law, but is instead with the law itself.

In the summary judgment ruling, the Court considered and rejected Colliton's arguments going to the irrationality of the congregate worship restriction, including his

---

[4] The Court notes that defendants did, indeed, state their reasons/purposes/objectives, to wit, safety.

9

argument that prison personnel could have implemented some form of segregated group worship at *de minimis* impairment to defendants' security concern. (Tr. at 25.)[5] The Court found Colliton's argument unavailing, stating, correctly, "this [suggestion] is pure conjecture and is insufficient to raise a triable issue of material fact." (*Id.*) Because this aspect of Colliton's motion for reconsideration again expresses nothing more than disappointment at the Court's previous ruling, it is denied.

### 3. Deliberate Indifference to Safety Claim

Colliton also seeks reconsideration of the Court's dismissal of his deliberate indifference to safety claim. "[P]rison officials have a constitutional duty to act reasonably to ensure a safe environment for a prisoner when they are aware that there is a significant risk of serious injury to that prisoner." *Heisler v. Kralik*, 981 F. Supp. 830, 837 (S.D.N.Y. 1997). "A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment." *Farmer v. Brennan*, 511 U.S. 825, 828 (1994). The prison official must "know[] of and disregard[] an excessive risk to inmate health or safety." *Cicio v. Graham*, No. 08-CV-534, 2010 WL 980272, at *15 (N.D.N.Y. Mar. 15, 2010). A substantial or excessive risk of serious harm "contemplates a condition of urgency, one that may produce death, degeneration, or extreme pain." *Gibson v. DiRubbio*, No. 99 Civ. 3202, 2000 WL 1159553, at *3 (S.D.N.Y. Aug. 16, 2000).

---

[5] In determining whether a plaintiff has met his burden of proving that a restriction is not rationally related to a legitimate penological interest, courts consider (1) whether the challenged regulation or restriction is rationally connected to the articulated objective; (2) whether the prisoner has alternative means of exercising the restricted right; (3) the impacts on prison guards, inmates, and resources of accommodating the restricted right; and (4) the possibility of alternative means of facilitating exercise of the right that only have a *de minimis* adverse effect on the penological interest. *Salahuddin*, 467 F.3d at 274.

However, prison officials, such as defendants here, will be granted summary judgment on deliberate indifference claims if entitled to qualified immunity. *McKenna v. Wright*, 386 F.3d 432, 436-37 (2d Cir. 2004). To establish qualified immunity, "the defendants must show that it was 'objectively reasonable,' for them to believe that they had not acted with the requisite deliberate indifference." *Id*. at 437 (citing *Ford v. McGinnis,* 352 F.3d 582, 597 (2d Cir. 2003)). In other words, so long as a rational jury would find that reasonable officers could disagree about the constitutionality or legality of their actions, defendants will be entitled to qualified immunity and, therefore, summary judgment on Colliton's deliberate indifference claim. *5 Borough Pawn, LLC v. City of New York*, 640 F. Supp. 2d 268, 285 (S.D.N.Y. 2009).

Colliton avers that the Court mistakenly considered only whether defendants were entitled to qualified immunity in deciding to transfer him from CCHU to GPE—a decision for which the Court found defendants entitled to immunity—and not whether defendants were also so entitled in *failing* to transfer him back to CCHU after becoming aware of his treatment in GPE. (Pl.'s Letter Mot. for Reconsideration at 2.) Colliton contends that the latter claim is clearly asserted in his Amended Complaint, and that reasonable officers could not disagree that keeping him in GPE exhibited deliberate indifference to his safety. (*Id*.) Colliton's reading of his Amended Complaint is correct—it does allege deliberate indifference in connection with his retention in GPE. (*See*, *e.g.*, Am. Compl. ¶ 156 ("[A]fter learning of plaintiff's situation and how plaintiff was being terrorized in the GP[E], [defendant Horn] was required . . . to, but failed to, remedy the violations of plaintiff's rights by returning plaintiff to the CCH[U]."); ¶ 157 (same regarding defendant Thomas); ¶ 161 (same regarding defendant Walsh).) Yet in its

11

September 16, 2009 decision, the Court ruled only that "a rational jury would conclude that reasonable officers would disagree about the legality of transferring the plaintiff from CCHU to the GPE," (Tr. at 38), and did not separately address whether the same was true about the legality of keeping Colliton in GPE and not returning him to CCHU. (*See id*. at 37-39.)

Colliton was originally transferred from CCHU to GPE in June 2006. He claims that three incidents occurring between May 4, 2007 and June 20, 2007 created a substantial risk to his health and safety requiring his return to CCHU. The first incident occurred on May 4, 2007, when an inmate named Jevon Lawyer punched Colliton "four or five" times in the back of the head. (Colliton Dep. at 140-141, 149.) The incident lasted "[a] few seconds," after which an officer "came over" and told everyone to "go back to your cells." (*Id*. at 150.) Colliton did not go to the infirmary, did not see a doctor, and had no lesions or other physical injuries other than short-term pain. (*Id*. at 150-152.)

Colliton had no further altercations with Lawyer; however, on May 26, 2007, another inmate, Duane Forbes, punched Colliton "five or six" times in his "arms and chest" while Colliton was watching television. (*Id*. at 154-155.) During the attack, Forbes "said, 'I'm going to kill you[,]' [b]ut not like he was going to do it at that time." (*Id*. at 155.) Colliton walked away from Forbes and immediately reported the incident. (*Id*. at 160.) As with the Lawyer incident, Colliton neither went to the infirmary nor saw a doctor after the altercation; and though he had pain, Colliton suffered no injuries. (*Id*. at 160-162.) Colliton was, however, transferred back to CCHU for "maybe three, four,

12

[or] five days," after which he returned to GPE.  (*Id*. at 166)  Forbes had been removed from Colliton's house in GPE by the time Colliton returned from CCHU.  (*Id*.)

One month later, on June 20, 2007, Colliton was playing poker with several other inmates, including Juan Guerrera.  (*Id*. at 169-170.)  The inmates were betting with food.  (*Id*. at 171.)  Guerrera became upset with another inmate, Gin Lin; and when Colliton told Guerrera to relax, Guerrera punched Colliton in the face "two or three" times.  (*Id*. at 169-170, 173.)  The incident left Colliton with a bloody, but not broken, nose and a cut on his lip.  (*Id*. at 174-176.)  After getting punched, Colliton "sort of made a quick move" over to the guards.  (*Id*. at 174.)  Afterwards he was taken to the clinic and proscribed ice for his nose.  (*Id*. at 176.)  When Colliton returned to the housing area, Guerrera had been "sent away."  (*Id*. at 180.)  After the Guerrera altercation Colliton remained in GPE until October 2007 without further incident.  At that point he was released pursuant to his plea agreement.

The risk of harm presented by Colliton was not sufficiently serious to support a deliberate indifference claim.  Minor altercations among prisoners are an unfortunate fact of prison life, and not every altercation supports a deliberate indifference claim.  *See Farmer*, 511 U.S. at 834 ("It is not, however, every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety."); *Hamilton v. Riordan*, No. 07 Civ. 7163, 2008 WL 4222089, at *1 (S.D.N.Y. Sept. 11, 2008) ("[N]ot every prison scuffle is a matter of constitutional import, and the mere existence of the chance that a prisoner might be injured by another prisoner does not violate the Eighth Amendment.").[6]  The fact that Colliton was subject

---

[6] Colliton claims that defendants "learn[ed] of plaintiff's situation and how plaintiff was being terrorized in the GP[E]."  (Pl.'s Letter Mot. for Reconsideration at 2.)  To the extent that Colliton faced verbal threats,

to a few minor incidents over a sixteen month period is not sufficient to establish the risk of harm necessary for a deliberate indifference claim. A deliberate indifference claim arising out of prison personnel's alleged "fail[ure] to protect [an inmate] from assault by other inmates . . . contemplates a condition of urgency, one that may produce death, degeneration, or extreme pain." *Gibson*, 2000 WL 1159553, at *3. "Minor injuries" from random altercations do not establish the required condition. *See id*. (finding no substantial risk of serious harm when guards knew of plaintiff's prior altercation with specific prisoner which led to second fist-fight resulting in undescribed "minor injuries"); *Bolton v. Goord*, 992 F. Supp. 604, 627 (S.D.N.Y. 1998) (allegations of safety risks arising from "double-celling" and resulting in "'minor' altercation[s]" . . . [and] isolated, de minimis incidents cannot support and Eighth Amendment [deliberate indifference] claim.").

Here the three incidents involving Colliton were minor, spontaneous, and unrelated. Moreover they resulted in no more than a cut lip, a bloody nose, and broken glasses. Taken singularly and collectively, they do not "contemplate a condition of urgency, one that may produce death, degeneration, or extreme pain," *Gibson*, 2000 WL 1159553, at *3, and therefore they do not establish a substantial risk of serious harm. In addition, while in GPE—including during the incidents in question—Colliton, and every other inmate there, was monitored by at least one guard at all times. (Def.'s 56.1 Statement ¶ 41; *see generally* Colliton Dep. at 140-173.) And indeed, those guards

---

even death threats, during the eleven months while in GPE before the altercation with Lawyer—from June 2006 through May 2007—those threats cannot give rise to a deliberate indifference claim absent evidence that Colliton was simultaneously subject to physical assault from the threatening inmates or that other inmates in situations similar to Colliton's were physically harmed. *See Green v. City of New York Dep't of Corrections*, No. 06 Civ. 4978, 2008 WL 2485402, at *6 (S.D.N.Y. June 19, 2008) (absent evidence of physical harm to plaintiff or of physical harm to another inmate is the same gang, "the mere existence of threats" causes "Plaintiff's claim that he was subject to a *substantial risk of serious harm*" to fail (emphasis in original)).

14

quickly quelled each random altercation as it arose—after the second and third incidents the other prisoner involved was removed from Colliton's house in GPE, and after the second incident Colliton was, in fact, placed back in to CCHU for several days.

Finally, even assuming, *arguendo*, that Colliton was able to establish a substantial risk of serious harm, defendants would nevertheless be entitled to qualified immunity. Qualified immunity requires that defendants be granted summary judgment when "the defendant officer[s], confronted with the facts as alleged by plaintiff, could reasonably have believed that [their] actions did not violate some settled constitutional right." *5 Borough Pawn*, 640 F. Supp. 2d at 285 (citing *Stephenson v. Doe*, 332 F.3d 68, 77-78 (2d Cir. 2003)). Thus Colliton must show that the only rational conclusion reasonable officers could draw looking at the facts alleged would be that his retention in GPE was unconstitutional.

Colliton fails to meet this burden. Colliton makes two arguments why "[r]easonably competent officials could **NOT** disagree as to whether [**NOT** transferring me *back* to CCH[U]] would violate clearly established rights." (Pl.'s Letter Mot. for Reconsideration at 2 (emphasis in original).) Both are unavailing. First, Colliton argues that Capitan Rice's May 26, 2007 internal memorandum to defendant Bailey "required [Colliton] to be returned to CCH[U]." (*Id.*) That memo states (1) that Colliton informed Captain Flemister that Forbes had threatened him; and (2) that "Colliton [had been] placed in Close Custody because of the nature of his case," that he had later been moved to GPE, and that Rice was "requesting for him to be placed into Protective Custody." (Def.'s Opp'n dated Dec. 18, 2008, Ex. 12 ("Rice Mem.").) The fact is, however, that Colliton *was* returned to CCHU for several days after his altercation with Forbes on May

15

26 and due to Forbes's threats that day. (Colliton Dep. at 166.) And upon his return to GPE, Forbes had been removed from Colliton's housing unit. (*Id.*) In other words, defendants appear to have complied with Rice's orders. Colliton seems to understanding Rice's memorandum as requiring that he remain in CCHU indefinitely; but reasonable officers could surely believe that upon removing the source of the random and singular threat, returning Colliton to GPE after several days in CCHU was constitutional. Therefore, the contention that reasonable officers could have found only that Colliton's retention in GPE was unconstitutional is not supported by invocation of Rice's memorandum.

Colliton's second argument is that he made the terror he faced in GPE known to defendants by filing his February 14, 2007 complaint in this case. (Pl.'s Letter Mot. for Reconsideration at 2.) This as well, however, does not lead to the conclusion that reasonable officers could not disagree about whether their retention of Colliton in GPE was legal. Colliton's complaint makes allegations; it does not establish facts. The complaint is, essentially, a more official version of the complaints he had already made to prison officials. That defendants had notice, both formal and informal, of Colliton's complaints has no bearing on the reasonableness of their retention of Colliton in GPE. Accordingly, on reconsideration, the Court grants defendants summary judgment as to Colliton's claim that keeping him in GPE constituted deliberate indifference to his safety, and that claim is dismissed.[7]

---

[7] What is more, as the Court found at oral argument, "[t]he undisputed evidence establishes [that] GPE is a highly protective level of custody in which inmates are monitored by corrections officers and kept separate from other category inmates during recreation and mealtimes. Indeed, it was the highest level of protective custody at Rikers Island until shortly before the incidents complained of." (Tr. at 39; *see also* Defs.' 56.1 Statement ¶¶ 41-42.) This too demonstrates the reasonableness, or really the lack of unreasonableness, of keeping Colliton in GPE.

16

**B. Motion to Amend**

In addition to moving for reconsideration, Colliton also moves to amend his pleadings to add a claim against all defendants under RLUIPA. Because Colliton did not exhaust his administrative remedies regarding this claim, however, the amendment would be futile and must be denied.

"A district court has broad discretion in determining whether to grant leave to amend [pleadings]." *Gurary v. Winehouse*, 235 F.R.D. 792, 801 (2d Cir. 2000). The court should freely grant leave to amend absent undue delay, bad faith, futility, dilatory motive, or undue prejudice. *Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566, 603-04 (2d Cir. 2005). Futility, invoked here by defendants, turns on whether the additions state a claim that could withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 258 (2d Cir. 2002).

Under the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e, prisoners must exhaust all available administrative remedies before pursuing a lawsuit in federal court.[8] *See* 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."); *Porter v. Nussle*, 534 U.S. 516, 532 (2002) (exhaustion is required for "all inmate suits about prison life"). RLUIPA actions are included among the actions under "other Federal law" for which the PLRA requires

---

[8] The PLRA's exhaustion requirement does not cover suits instituted by former prisoners after release challenging the conditions in question. *Greig v. Goord*, 169 F.3d 165, 167 (2d Cir. 1999). The requirement does apply, however, in cases like the one at bar where the plaintiff instituted the case while in custody. *Berry v. Kerik*, 366 F.3d 85, 88 (2d Cir. 2003).

17

exhaustion. *See Prescott v. Annetts*, No. 09 Civ. 4435, 2010 WL 3020023, at *2-3 (S.D.N.Y. July 22, 2010) (applying PLRA's exhaustion requirement to RLUIPA claim); *Chavis v. Goord*, No. 9:00-CV-1418, 2007 WL 2903950, at *3 n.3 (N.D.N.Y. Oct. 1, 2007) ("claims under RLUIPA . . . are subject to the requirement of exhaustion"). To properly exhaust a claim, a prisoner must comply with state grievance procedures. *Jones v. Bock*, 549 U.S. 199, 218 (2007). Merely "[a]lert[ing] the prison officials as to the nature of the wrong for which redress is sought does not constitute proper exhaustion." *Macias v. Zenk*, 495 F.3d 37, 44 (2d Cir. 2007) (internal quotation marks and citation omitted). An "untimely or procedurally defective" administrative grievance also does not constitute proper exhaustion. *Woodford v. Ngo*, 548 U.S. 81, 83-84 (2006).

In New York, prisoners must exhaust all levels of the three-tiered grievance procedure: First, the prisoner must file a grievance with the Inmate Grievance Resolution Committee ("IGRC"). 7 N.Y. Comp. Codes R. & Regs. § 701.5(b). Second, the prisoner must appeal an adverse IGRC decision to the facility superintendent. *Id*. § 701.5(c). And third, the prisoner must appeal an adverse decision by the superintendent to Central Office Review Committee ("CORC"). *Id.* § 701.5(d). When a prisoner fails to properly exhaust his administrative remedies before filing suit, the action must be dismissed. *See Burgos v. Craig*, 307 F. App'x 469, 470 (2d Cir. 2008) ("[Exhaustion] must be completed before suit is filed, and completing the exhaustion requirements only after filing suit is insufficient."); *Neal v. Goord*, 267 F.3d 116, 121-22 (2d Cir. 2001), *abrogated in part on other grounds by Porter*, 534 U.S. 516. Likewise, post-exhaustion amendment of pleadings filed originally before exhaustion to reflect that exhaustion has become complete cannot cure the original nonexhaustion defect. *Neal*, 267 F.3d at 122.

Colliton argues that he properly exhausted his administrative remedies because defendants never responded to his initial grievance. This argument fails. In his complaint Colliton alleges that he "presented the facts related to this Amended Complaint in grievances on numerous occasions . . . in complete compliance with [prisoner grievance procedures]. However . . . the [Department of Corrections] did not respond to such grievances." (Am. Compl. ¶ 30; *see also* Pl.'s Mem. in Support of Mot. to Amend. at 3 ("Plaintiff alleged that he filed grievances relating to [his treatment], that Defendants were required to respond to such grievances, but did not, and that the deadlines for responding have long expired. Thus Plaintiff exhausted his administrative remedies." (citing the Am. Compl.)).) In this Circuit, however, "the lack of a response from the [IGRC] does not excuse an inmate's obligation to exhaust his remedies through available appeals." *Hargrove v. Riley*, No. CV-04-4587, 2007 WL 389003, at *8 n.15 (E.D.N.Y. Jan. 31, 2007) (internal quotation marks omitted). Indeed, plaintiff is "required to appeal any unsatisfactory response (including lack of response)." *Acosta v. Corrections Officer Dawkins*, No. 04 Civ. 6678, 2005 WL 1668627, at *3 (S.D.N.Y. 2005). Thus plaintiff's failure to exhaust his administrative remedies is not excused by any failure on the part of defendants to respond to his grievances.[9]

---

[9] The Second Circuit has recognized an exception to the exhaustion requirement, however, when administrative remedies were not in fact "available" to the prisoner. *Hemphill v. New York*, 380 F.3d 680, 686 (2d Cir. 2004). Such might be the case when, for example, the plaintiff presents evidence that the prison did not actually provide grievance procedures or that the plaintiff faced threats that caused available remedies to be "effectively unavailable." *Id.* at 686-87. In an otherwise unavailing discussion of exhaustion, Colliton's reply brief contains the sentence: "Exercise in futility." (Pl.'s Reply Mem. at 2.) Though this hardly raises an availability argument in an explicit manner, the Court discusses that possible argument nonetheless. As to the second option, Colliton makes no allegation that he could not or did not file grievances or appeals because he felt threatened. And as to the first, the fact that Colliton admits he filed numerous grievances challenging several aspects of his prison experience undermines any argument that the prison did not offer him grievance procedures. Indeed, as a policy matter it seems that a ignorance of a grievance is appealed to a higher authority precisely because that procedure allays a prisoner's fear that lower-level prison authorities will continue to ignore his complaints. Thus Colliton has no credible argument—if he even makes one—that grievance procedures were unavailable.

Because Colliton did not exhaust his administrative remedies regarding his RLUIPA claim, and because he is not excused from that requirement, his motion to amend pleadings is futile and is denied.

### III. CONCLUSION

For the reasons stated above, Colliton's motion for reconsideration is granted in part and denied in part; on reconsideration defendants are granted summary judgment on Colliton's deliberate indifference to safety claim and that claim is dismissed; and Colliton's motion for to amend his complaint is denied. The parties are directed to appear for a status conference on Friday, April 29, 2011 at 10:30 a.m. in Courtroom 17B, 500 Pearl Street, New York, NY 10007.

SO ORDERED.

Dated: New York, New York
       March 22, 2011.

                                            Richard J. Holwell
                                            United States District Judge

20